FILED
2008 DEC 9 PM 4:46
CLERK
U.S. BANKRUPTCY
COURT - PGH

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| PAUL BARTOCK, | : | Case Number 08-20174 TPA |
| *Debtor,* | : | Chapter 11 |
| | | |
| PAUL BARTOCK, | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | Adversary No. 08-2045 TPA |
| | : | |
| BAE SYSTEMS SURVIVABILITY | : | |
| SYSTEMS, LLC, as successor in | : | |
| interest to O'GARA-HESS & | : | |
| EISENHARDT ARMORING CO., | : | Related to Document No. 46 |
| L.L.C., | : | |
| *Defendant.* | : | |

*Appearances:*      Michael Kaminski, Esq. for Plaintiff
John R. Gatoskie, Jr., Esq. for Defendant

## MEMORANDUM OPINION

On October 14, 2008, the Debtor, Paul Bartock ("Bartock") filed an **Emergency Motion to Enforce Settlement and for Sanctions** ("Emergency Motion") at Document No. 46, with reference to a settlement which previously resolved the within Adversary Proceeding. The *Emergency Motion* essentially asks for an order providing under the terms of the settlement that the Bartock is free to go to work for a company called Ibis Tek, Inc. ("Ibis Tek"), a competitor of Defendant BAE Systems Survivability Systems, Inc. ("BAE").

1

On October 20, 2008, the Court originally convened a hearing on the *Emergency Motion*. At that time the matter was stayed without decision, pending the results of a judicial mediation which the Parties had previously agreed to undertake in an effort to resolve a number of open matters. In that mediation, completed on October 28, 2008, the Parties were successful in reaching an agreement resolving many of their differences but the particular issue which is the subject of the *Emergency Motion* was not among them. As such, Counsel for Bartock requested that this Court resume the hearing on the *Emergency Motion*.

On November 13, 2008, an evidentiary hearing on the *Emergency Motion* was held and both sides given a full opportunity to present their cases. There was little in the way of factual dispute, at least in regard to the issue relevant to the *Emergency Motion*. The undecided issue pertaining to the *Emergency Motion* centers around the effective, legal extent of the settlement agreement that was reached by the Parties and subsequently reduced to an Order of this Court. At the conclusion of the evidentiary hearing the Court informed Counsel for the Parties that it would defer making a decision on the *Emergency Motion* for a short time to allow them one last opportunity to try to amicably resolve the issue presented by the *Emergency Motion*. That time has now passed with no such agreement. The Court must therefore decide the *Emergency Motion*. For the reasons stated below, the relief requested by Bartock will be granted.[1] However, before providing an analysis of the *Emergency Motion* resulting in this Court's decision, it is necessary to first give a rather lengthy recitation of the history which led up to it.

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to *Fed.R.Bankr.P. 7052.*

# FACTUAL AND PROCEDURAL BACKGROUND

### *(a)  Matters Occurring Pre-Bankruptcy*

Bartock was formerly employed by a company called O'Gara-Hess & Eisenhardt Armoring Co., L.L.C. ("O'Gara"), a predecessor in interest to BAE, at a facility in Fairfield, Ohio. During his employment with O'Gara, Bartock worked on different projects and for a time held the job title of Program Manager of the "Up-Armored High Mobility Multi-Purpose Wheeled Vehicles" program at O'Gara.  While thus employed, on September 6, 1996, Bartock and O'Gara entered into an agreement ("Noncompete Agreement") that included the following provision:

> The Employee hereby covenants and agrees to refrain, during his employment by the Corporation and for a period of two (2) years after the date of termination of the Employee's employment by the Corporation, from directly or indirectly owning any interest in or engaging in or performing any service for any person, firm, or corporation that directly or indirectly engages in any business which competes with any aspect of the business of the Corporation either as an individual on his own behalf, or as a partner, employee or agent for any person or partnership, or as an employee, officer, agent, director or shareholder of a corporation. The Employee will not at any time during the period of the Employee's employment by the Corporation and for a period of two (2) years thereafter induce or assist others to induce or attempt to induce, in any manner, directly or indirectly, any employee, agent, representative, customer or any other person or concern dealing with or in any way associated with the Corporation to terminate or to modify in any other fashion to the detriment of the Corporation such association with the Corporation. The Employee represents that his experience and capabilities are such at the provisions of this paragraph will not prevent him from earning a livelihood.

Noncompete Agreement at ¶4.  *See BAE Evidentiary Hearing Exhibit* 3, Document No. 76.  The Noncompete Agreement also contained a provision obligating Bartock to treat certain O'Gara material as confidential.  Noncompete Agreement at ¶3.  *See BAE Evidentiary Hearing Exhibit* 3, Document No. 76.

At the end of September 2005, Bartock left employment with O'Gara and began to work for a company known as "Specialty Defense" at a facility located near Scranton, Pennsylvania.[2] Bartock only worked for Specialty Defense for about three months when his employment was terminated on January 12, 2006. Shortly thereafter he was hired by Ibis Tek, a competitor of BAE, to work at a facility near Pittsburgh, PA.

On April 4, 2006, BAE filed an action in the Court of Common Pleas of Butler County, Ohio, at case number CV 2006 04 1157 ("the Ohio Action") against Bartok, Ibis Tek, and two of the owners of Ibis Tek ("the Buckners"), seeking monetary damages and injunctive relief, and alleging among other things, that Bartok had violated the Noncompete Agreement and misappropriated BAE trade secrets in connection with his employment by Ibis Tek. That same date the court in the Ohio Action issued an initial, temporary restraining order enjoining Bartok from being employed by Ibis Tek and enjoining Ibis Tek from employing him. As a result, Bartock was placed on paid administrative leave by Ibis Tek a few days later. On May 19, 2006, the Court in the Ohio Action entered an "Amended Agreed Order" which superseded the April 4, 2006 initial temporary restraining order. This Amended Agreed Order, which is indicated to have been entered by "agreement of the parties," includes the following pertinent provisions:

> (a)     That Defendant, Paul Bartock, is preliminarily enjoined from directly or indirectly owning any interest in or engaging in or performing any services of any sort for Ibis Tek, L.L.C. or any

---

[2]     O'Gara and Specialty Defense were affiliated companies, both having a common owner. The Parties have a disagreement as to whether the "termination of employment" event triggering the two year period set forth in the Noncompete Agreement therefore occurred when Bartock left O'Gara. *See BAE Concise Statement of Material Facts,* Document No. 25, at ¶¶31-32; *Bartock Concise Statement of Material Facts,* Document No. 29, at ¶¶31-32. The Court does not need to reach the answer to that question in deciding the *Emergency Motion.*

other person, firm or corporation that directly or indirectly engages in any business which competes with any aspect of the current business of O'Gara-Hess either as an individual or on his own behalf , or as a partner, employee or agent for any person or partnership or as an employee, officer, agent, director or shareholder of a corporation.

(b)     That Defendant, Paul Bartock, is preliminarily enjoined from inducing or assisting others to induce or attempt to induce in any manner, directly or indirectly, any employee, agent, representative, customer or any other person or concern dealing with or in any way associated with O'Gara-Hess to terminate or to modify in any other fashion to the detriment of O'Gara- Hess such association with O'Gara- Hess.

......

This order shall expire upon further order of the court, following notice and hearing, or agreement of the parties.

Amended Agreed Order, *see BAE Evidentiary Hearing Exhibit 1*, Document No. 76.[3]  Without involving unnecessary detail, it suffices to say that thereafter the Ohio Action proceeded.

On July 28, 2006, Bartock received his last payroll check from Ibis Tek.  Bartock alleges that on November 2, 2007, he filed a motion in the Ohio Action seeking to modify the Amended Agreed Order to allow him to seek employment with other companies that are competitors of BAE (excluding Ibis Tek, which was still an active defendant in the case at the time) on the ground that more than two years had then passed since he had left employment with O'Gara-Hess. However, BAE opposed that motion and the Amended Agreed Order was not modified.[4]

---

[3]      A comparison of the language from Paragraph 4 of the Noncompete Agreement and these provisions of the Amended Agreed Order shows that aside from the specific reference to Ibis Tek and a few minor changes, the Amended Agreed Order was adopted almost verbatim from the Noncompete Agreement.

[4]      The record is not clear whether the motion was denied or simply not decided.

5

On December 4, 2007, a "Settlement and Release Agreement" in the Ohio Action was entered into by BAE on the one hand and Ibis Tek and the Buckners on the other (hereinafter referred to as the "BAE-Ibis Tek Agreement").   Among other covenants, the BAE-Ibis Tek Agreement provided that Ibis Tek and the Buckners would pay BAE $5,000,000 in damages payable in increments of $1,250,000 over a 4 year period in return for BAE terminating the Ohio Action as against them.  As will become more apparent later in this Opinion, another provision of the BAE-Ibis Tek Agreement, Paragraph 11(d), may be significant with respect to the issues raised by the present *Emergency Motion,* and it provides in relevant part:

> (d) ... Further, Ibis Tek, and each of the Buckners, on behalf of themselves and each of their respective Controlled Parties, agree that, after the Agreed Order of Dismissal is entered, Ibis Tek, and each of the Buckners on behalf of themselves and each of their respective Controlled Parties will not directly or indirectly employ Bartock nor will they permit Bartock to directly or indirectly engage in or provide services of any sort for Ibis Tek, either of the buckners or their Controlled Parties until the last to occur of the following (the "Non-Compete Period"): (a) the Agreed Restraining Order [or Amended Agreed Order as this Court is calling it in this Opinion] *is* no longer enforceable as to Bartock; (b) any other court order preventing Bartock from being employed by, engaging in or providing services for ibis Tek or the Buckners is no longer enforceable as to Bartock; or (c) the term of any agreement which prevents Bartock from being employed by, engaging in or providing services  for Ibis Tek or the Buckners expires.

BAE-Ibis Tek Agreement *at ¶11(d), see BAE Evidentiary Hearing Exhibit 2*, Document No. 76.

After the dismissal of Ibis Tek and the Buckners from the Ohio Action pursuant to this settlement, the case proceeded as against the sole remaining defendant, Bartock.  On December 19, 2007 the court in the Ohio Action granted partial summary judgment in favor of BAE as to Counts I and II, finding that Bartock had breached the non-competition and confidentiality

provisions of the Noncompete Agreement.[5]  A trial on the remaining issues apparently limited to the

amount of damages, if any, to be awarded with respect to the Count I and II claims and liability and

damages on the other claims, was scheduled to begin on January 23, 2008.  Before that could

happen, however, on January 9, 2008, Bartock filed his Chapter 11 Bankruptcy Petition in this

Court.


### (b) Matters Occurring Post-bankruptcy
### (i) Adversary No. 08-2045

The filing of the petition in this case immediately stayed the Ohio Action.  The Court

is unaware of any further activity having taken place in the Ohio Action since the filing of this case

except for an unsuccessful attempt by Bartock to remove the Ohio Action to the United States

Bankruptcy Court for the Southern District of Ohio.

On February 4, 2008, Bartock initiated the present Adversary Proceeding by filing

a *Complaint for Declaratory and Equitable Relief*, Document No. 1, followed a few days later by

an *Amended Complaint for Declaratory and Equitable Relief* ("Amended Complaint"), Document

No. 5, to come into compliance with Local Rules.  He alleged that he has received no wages from

any source since July 28, 2006, and has supported himself through loans from family members and

---

[5]        In this same decision, the Ohio state court denied BAE's motion for summary judgment with respect to its Count
IV claim for breach of duty of loyalty and good faith.

acquaintances.[6]  He further alleged that he has sought employment from employers who are not

competitors of BAE but has not been able to obtain such employment at a pay level anywhere near

that which he had been making at BAE or Ibis Tek. Bartock's prayer for relief in the Adversary

Proceeding was for the Court to enter an order:

> a.      Declaring that his obligations to O'Gara-Hess for any breach of the
>         noncompete agreement are claims subject to discharge.
> b.      Declaring that pursuant to section 524(a) of the Bankruptcy code,
>         a discharge will void any injunction issued against Paul Bartock as
>         a result of any breach of the noncompete agreement; and
> c.      Authorizing Paul Bartock to immediately seek employment from
>         Ibis Tek or any other competitor of BAE Systems Survivability
>         Systems, LLC as successor in interest to O'Gara-Hess.

*Amended Complaint* at the "Prayer for Relief", Document No. 5.

BAE initially responded by vigorously defending the Adversary Proceeding, filing

its *Motion of BAE Systems Survivability Systems, L.L.C. to Dismiss or in the Alternative to Abstain*

*("Motion to Dismiss"),* Document Nos. 8 and 21[7], arguing that the Adversary should be dismissed

pursuant to *Fed.R.Civ.P. 12(b)(1)* for lack of subject matter jurisdiction, or *12(b)(6),* for Bartock's

failure to state a claim upon which relief can be granted, both of which provisions are incorporated

into bankruptcy procedure pursuant to *Fed.R.Bankr.P. 7012.*  On May 19, 2008, the Court issued

an Order stating that it would treat the *Motion to Dismiss* as one for summary judgment pursuant

---

[6]      At the evidentiary hearing Bartock testified that he indirectly benefitted from income generated by a consulting business called Taurus Consulting run by his wife.  He testified that Taurus Consulting realized income of about $6,000 per month starting in April 2008 through October 2008 and that this income was deposited into the joint account of he and his wife.  The sole customer of Taurus discontinued the relationship after October and Taurus is no longer generating income.

[7]      This Motion was originally filed at Document No. 8, but dismissed without prejudice for noncompliance with *Fed.R.Bankr.P. 7007.*  The Motion was then refiled at Document No. 21.

to *Fed.R.Civ.P. 12 (d)*, directing BAE to file an *Answer* to the *Amended Complaint*, requiring Bartock to file a *Response* to the *Motion to Dismiss*, and, directing the Parties to file concise statements of material facts. *See* Document No. 22.

After the required filings were made by the Parties, on July 14, 2008, the Court heard argument on the *Motion to Dismiss*. At that time, the Court was advised that there had not yet been any action taken by the Southern District of Ohio Bankruptcy Court with respect to Bartock's effort to remove the Ohio Action to that court. At the argument Bartock's attorney also acknowledged a continuing obligation existed on Bartock's part to refrain from using or disclosing confidential BAE information pursuant to Paragraph 3 of the Noncompete Agreement. Based on that admission, the Court indicated it would be inclined to issue an order permanently enjoining him from doing so. Bartock did not object to such an order. However, as to other matters related to the *Motion to Dismiss*, the Court did not indicate how it would rule, taking the matter under advisement pending BAE's response to some additional factual allegations that had been raised in the *Bartock Concise Statement*. The Court did express some concern about how Bartock could be kept from working for any BAE competitor indefinitely, as BAE seemed to be urging, when by the most generous possible interpretation of the Noncompete Agreement from BAE's perspective, the two year noncompete period seemed set to expire on July 28, 2008, the second anniversary of Bartock's last receipt of payment from Ibis Tek.[8]

---

[8]        Other possible dates for the two year noncompete period to have run were the end of September 2007 (2 years after Bartock left O'Gara) or January 12, 2008 (2 years after Bartock's employment with Specialty Defense was terminated).

While Bartock filed a response to the additional factual allegations raised by the *Motion to Dismiss,* he allowed the due date for filing his Pre-trial Statement to pass without it being filed. As a result, on July 25, 2008, the Court entered an Order scheduling a Rule to Show Cause hearing for August 11, 2008, directing Bartock's attorney to personally appear and show cause why he should not be sanctioned for his failure to file a Pre-trial Statement. *See* Document No. 39.

### *(ii) The Parties' Settlement*

At the August 11, 2008 hearing, Counsel for Bartock stated that he had not filed the required Pre-trial Statement because the Parties had reached a settlement with respect to Adversary No. 08-2045 that would "allow Mr. Bartock to go back to work or to become gainfully employed." *See Certified Transcript of Proceeding* held Aug. 11, 2008, p. 4, l. 7-8, Document No. 53. Counsel for Bartock further indicated that a "consent settlement and order" memorializing the Parties' agreement on this issue had been circulated although, because of vacations, a final version had yet to be signed. He stated that the settlement would not resolve the "dischargeability issues" between the Parties. Furthermore, Bartock remained opposed to any Order providing any relief from stay since that would permit BAE to resume the Ohio Action which he argued was not necessary because the amount of BAE's claim could be litigated in this Court.[9]

---

[9]    By way of further explanation, the dischargeability issue being referred to at this point was BAE's contention that pursuant to *11 U.S.C. §§523(a)(4)* and *(6)*, Bartock should not be discharged from any debt to BAE arising from the events underlying the Ohio Action. These matters were the subject of another, pending Adversary Proceeding filed by BAE in this bankruptcy on June 2, 2008, at Adversary No. 08-02216 against Bartock. As to the matter of "relief from stay," that comment was a reference to a *Motion for Relief from Stay* that BAE filed in the main bankruptcy case on April 23, 2008 seeking leave to "complete" the Ohio Action. *See* Document No. 77 in Case No. 08-20174. These two items, both of which were also on the agenda for the August 11, 2008 hearing, will be discussed further later in this Opinion.

In response to these representations, Counsel for BAE confirmed that the representation about the Parties having reached a settlement was accurate. *Id.* at p. 5, l. 24 through p. 6, l. 18. He expressed confidence that the two sides would be able to agree on a stipulated order for the Court to sign. He also raised the possibility of referring the remaining, open matters pending between the Parties to judicial mediation (something this Court previously suggested as a possibility) and proposed a stay of these other matters pending completion of the mediation. Bartock's Counsel was agreeable to the proposed judicial mediation.

Based on the representations of Counsel at this hearing, the Court did a number of things. After expressing its appreciation that the Parties were able to reach a settlement with regard to this Adversary Proceeding, it informed them that it expected the stipulated settlement agreement to be filed within 20 days. The Court also approved the Parties' request to submit the remaining issues to judicial mediation. A *Mediation Referral Order* was entered on August 12, 2008, referring these matters to the Honorable Judge Jeffery A. Deller and, consistent with the Parties' agreement, all matters between the Parties were stayed pending the results of the mediation except for those matters involving the settlement they reportedly had reached concerning this Adversary. *See* Document No. 42.

On August 26, 2008, the Parties filed a memorialization of their settlement in the form of a *Stipulation, Settlement Agreement and Agreed Order Providing for the Compromise and Settlement of Claims Raised in the Adversary Proceeding at No. 08-02045* ("Stipulation"), Document No. 43, signed by both Parties. The *Stipulation* provided, *inter alia*, that Bartock agreed to be bound by those portions of the Noncompete Agreement respecting the nondisclosure of

11

confidential BAE information, including the entry of a permanent injunction against him to that effect.  In exchange for this agreement, BAE agreed that "effective July 28, 2008, BAE has released Bartock from *any non-competition obligation* found at Paragraph 4 of the Noncompete Agreement." *See Stipulation* at ¶¶2,3 (emphasis added).  A copy of the Noncompete Agreement was attached as an exhibit to the *Stipulation*.

The *Stipulation* also included a separate, proposed injunction order meant to effectuate the nondisclosure aspect of the Parties' agreement.  However, the proposed order did not meet the formal requirements of *Fed.R.Civ.P. 65(d)(1)*, incorporated by *Fed.R.Bankr.P. 7065*, because it failed to describe the conduct being enjoined in reasonable detail.  Rather, it simply incorporated by reference the applicable provisions in the Noncompete Agreement.  For that reason and without setting a deadline for compliance, the Court informally notified Counsel for the Parties that it would sign the *Stipulation* as soon as the Parties submitted a conforming injunction order.  Since it assumed this to be a relatively easy task for the Parties to complete, the Court anticipated receiving the conforming, proposed order within a few days.  As it turns out, because there was no other activity taking place in the case around that time due to the efforts involved with the mediation referral, the matter fell by the way side and no conforming injunction order was provided by the Parties, and neither that Order nor the *Stipulation* was signed at that time by the Court.

*(iii)   The Emergency Motion*

The Court first became aware that there was a problem with the settlement the Parties had reached when Bartock filed his *Emergency Motion* on October 14, 2008.  The *Emergency*

12

*Motion* alleged that after reaching the settlement with BAE, Bartock had contacted Ibis Tek to advise it he was being released from his non-competition obligations by BAE and therefore he was able to return to work for Ibis Tek. (Document No. 46 at ¶38).  Ibis Tek in turn informed BAE  that it intended to offer Bartock employment in light of BAE's release of Bartock from the non-competition obligation and inquired as to whether any other obligations existed that might be implicated should it hire Bartock.  (*Id.* at ¶39).  BAE informed Ibis Tek that, notwithstanding the agreement to release Bartock, it believed he was still prevented from working for Ibis Tek by the Amended Agreed Order in the Ohio Action.  Hearing that, Ibis Tek understandably concluded that if it did hire Bartock it might well be accused of being in default of Paragraph 11(d)(a) of the BAE-Ibis Tek Agreement. Rather than face that potential result, Ibis Tek chose not to hire Bartock.

In response to Ibis Tek's refusal to rehire Bartock, Bartock's Counsel made efforts to convince BAE that the settlement agreement between the Parties had the effect of rendering the Amended Agreed Order moot and no longer enforceable as to Bartock.  When he was unsuccessful in that regard the *Emergency Motion* was filed.

In its *Response* to the *Emergency Motion,* BAE, while disagreeing with some of the peripheral details as alleged in the *Emergency Motion,* confirmed the essential point that it had in fact informed Ibis Tek that, until the Amended Agreed Order is lifted by the state court in the Ohio Action, Ibis Tek was precluded from hiring Bartock pursuant to the BAE-Ibis Tek Agreement. *See BAE Systems Survivability Systems L.L.C.'s Response to Paul Bartock's Emergency Motion to Enforce Settlement and Sanctions*, Document No. 51 at ¶¶40, 58-67, 75-77.  Despite the terms of the settlement reached in this Court (even though not yet formally approved by this Court) BAE

13

expressed the view that Ibis Tek was the one company in the world that Bartock could not work for. *Id.* at ¶57.

The Court scheduled a hearing on the *Emergency Motion* for October 20, 2008. The first item of business was to clarify the status of the *Stipulation* which had still not been signed by the Court to that point because the Parties had never submitted an injunction order in proper form. In response to the Court's inquiry, both Parties confirmed that they had reached a settlement agreement as embodied in the *Stipulation* and were still committed to it. *See Certified Transcript of Proceeding* Oct. 20, 2008 at p. 4-5. The Parties also agreed on the form of an injunction order for the Court to sign. Accordingly, the Court approved the *Stipulation* and signed the accompanying Injunction Order. *See* Document Nos 55, 57. The subject then turned to the *Emergency Motion.*

The Parties were given an opportunity to state their respective positions on the question of whether the *Stipulation* rendered the Amended Agreed Order non-enforceable against Bartock with respect to any non-compete obligations. The Court then noted that the previously agreed upon mediation before Judge Deller was scheduled for October 28, 2008, only a few days away, and inquired whether the Parties, in light of the current posture of the case, still thought it was worth proceeding with the mediation. Both Parties represented that they continued to believe it worthwhile to attempt the mediation since the possibility existed that a global resolution, including the issue raised in the *Emergency Motion*, might be reached. As a result, the Court entered an order staying a decision on the *Emergency Motion* pending the outcome of the judicial mediation. Likewise, the Court informed the Parties that it would be prepared to quickly schedule another hearing on the currently pending issue if the matter was not finally resolved by the mediation.

14

(iv)  *The Judicial Mediation*

On October 28, 2008, Judge Deller conducted the mediation which lasted for most of the day.  The Parties were able to reach an agreement on much of their overall dispute, but unfortunately, could not resolve the issue involved in the *Emergency Motion*.[10]  Bartock's counsel contacted the Court shortly after the conclusion of the mediation and stated that it would be necessary to reschedule a hearing on the *Emergency Motion* because the mediation had failed to resolve that matter.  The Court advised counsel that a hearing would not be held until either a written order was entered on the agreement that had been reached at the mediation, or at least the transcript was docketed.  The transcript was filed on November 5, 2008, and the Court scheduled an evidentiary hearing on the *Emergency Motion* for November 13, 2008.[11]

(v)  *The Evidentiary Hearing on the Emergency Motion*

The Parties presented witnesses and exhibits at the hearing.  There were no objections as to any of the exhibits offered.  Testifying on his own behalf, Bartok stated that his understanding of the Parties' settlement agreement was that he was released from all non-competition obligations

---

[10]     Based on a review of the filed transcript from the mediation, the main features of the settlement the Parties reached were that BAE agreed to withdraw Adversary No. 08-2216 with prejudice at which time Bartock would consent to lifting the stay to allow BAE to pursue the Ohio Action with respect to liability and damages.  Thereafter, any damage award issued in the Ohio Action will be deemed an allowed claim for purposes of this bankruptcy and any recovery made by Bartock in another, pending action in the District Court will be shared by he and BAE according to an agreed-upon formula. *See* Document No. 67.  The settlement reached at the mediation is to be reduced to a stipulated order, which to the Court's knowledge has not yet occurred, thus the reference to the transcript of the Order of Judge Deller rather than the specific, as-yet-to-be-filed written Order.

[11]     The Court had previously advised the Parties that if it became necessary to reconvene a hearing on the *Emergency Motion* it would expect the presentation of relevant testimony concerning the pending issue.

15

and could go to work for any employer, including Ibis Tek.  He said he would not have agreed to

a settlement if he had been told it did not include the ability to go to work for Ibis Tek.  Bartok

testified that he made efforts to obtain employment, such as sending out resumes and joining an

employment website, but has received no response to his inquiries except from Ibis Tek.  With

respect to that company, Bartok testified that he informed an individual named James Retter that he

was "now able" to return to employment at Ibis Tek based on the settlement agreement ending the

within Adversary Proceeding.  He testified that Mr. Retter indicated that Ibis Tek was pleased by

that development and was interested in hiring him but was required to contact BAE to first confirm

there was no problem with Bartok returning to work for Ibis Tek.  Subsequent to his conversation

with BAE, Mr. Retter advised Bartok that BAE stated to him that Ibis Tek would be in violation of

the BAE-Ibis Tek Agreement if it employed Bartock because the Amended Agreed Order in the

Ohio Action was "still enforceable" as against Bartok.  Under those circumstances, Mr. Retter

informed Bartock that no job offer could be extended.  Bartok testified that his current financial

condition is desperate and if he cannot obtain work soon he will have no choice but to travel to New

Mexico and live with his parents.

On cross-examination, Bartock testified that when he received the initial draft of the

settlement from BAE he asked his attorney about the absence of any specific reference in it to Ibis

Tek and proposed modifying the settlement agreement to include such a specific reference.  In

response, Bartok said he was advised that the settlement agreement covered Ibis Tek and that it was

not necessary to make such a modification.  Upon being so advised Bartock agreed to sign it as

presented to him.  Bartok was also questioned about the *Withdrawal of Objection to Request of BAE

Systems Survivability Systems, LLC's for Relief from the Automatic Stay, and Consent and Request*

*to the Immediate Entry of an Order Granting BAE Systems Survivability Systems, LLC Relief from*

*the Automatic Stay* ("Withdrawal"), filed on his behalf at Document No. 146 in the main case on his

behalf on November 7, 2008, pursuant to the agreement reached at the mediation. Counsel for BAE

directed Bartok's attention to Paragraph 10 of the *Withdrawal* which states:

> In accordance with the agreements reached at the mediation the Debtor
> hereby withdraws his objection to BAE being granted relief from the
> automatic stay. The Debtor further requests that this Court immediately
> enter an order granting relief from the automatic stay so that the Debtor can
> immediately seek the termination of the Agreed Preliminary Injunction [i.e.,
> Amended Agreed Order] by the Court of Common Pleas of Butler County,
> Ohio.

Bartok testified that the purpose of this language was to ask for relief "in parallel" to go to the Ohio

court regarding the Amended Agreed Order and "to cover the bases."

The second witness presented on behalf of Bartok was James Retter, who identified

himself as the Corporate Counsel and Vice President of Research and Development at Ibis Tek. He

generally confirmed Bartok's testimony regarding their contacts once the settlement agreement

between Bartock and BAE had been reached. He stated that in light of that settlement Bartok had

initially been offered a job as a program manager at Ibis Tek at a yearly salary of $125,000 plus a

possible bonus. The job would not involve Bartock working in an area similar to where he had been

working while at O'Gara. Mr. Retter also confirmed that subsequently Ibis Tek was not willing to

go through with the employment offer because of BAE's expressed opinion that to do so would be

a violation of the BAE-Ibis Tech Agreement. Mr. Retter confirmed that if a "judicial conclusion"

occurred as to the issue and the Amended Agreed Order in the Ohio Action is no longer enforceable

against Bartok, the offer of immediate employment would again be extended and available.

On cross-examination, Mr. Retter indicated that he had some personal familiarity with the negotiations involving the BAE-Ibis Tek Agreement, including Paragraph 11(d) thereof, and that was the reason he felt compelled to check with BAE before hiring Bartok. Ibis Tek could not afford to trigger a default in the agreement with BAE by hiring Bartock before all preconditions to his rehire were satisfied.

The final witness at the evidentiary hearing was George F. Stringer, III, who testified on behalf of BAE. Mr. Stringer is the Director of Armored Programs for BAE. He expressed the view that were Bartok to go to work for Ibis Tek he would inevitably be involved in matters involving competition between the two companies. Mr. Stringer pointed to an automatic door opening program at BAE that he thought Bartok was likely to be involved with if he goes to work for Ibis Tek. Mr. Stringer also gave several other reasons why he would be concerned if Bartok were to go to work for Ibis Tek. According to Stringer, one of BAE's most important customers is the United States Army, which has previously recommended that BAE work out its differences and continue doing business with Ibis Tek. As such, Mr. Stringer said that would mean settings and meetings where Bartok would be in the same room as BAE people, which would present a very uncomfortable situation because of "trust issues" with Bartok. Mr. Stringer also thought that Bartock's contacts with potential Ibis Tek customers could be adverse to BAEs business interests. He also expressed that ongoing security concerns about confidential BAE information that Bartok had learned or taken while working for BAE should preclude his employment with Ibis Tek.

On cross-examination, Mr. Stringer admitted that he had not been involved directly in any of the negotiations with Ibis Tek nor in the settlement agreement in this case. He

18

acknowledged that the BAE-Ibis Tek Agreement does not contain any restriction on Ibis Tek's use

of information that had been given to it by Bartok. He stated that he does not believe BAE has the

right to restrict Ibis Tech from hiring Bartok in perpetuity but believes that they do continue to have

the right to do so at present.

The Retter and Bartock testimony regarding the above matters was believable, sincere

and credible. However, other than confirming BAE's position that Ibis Tek could not rehire Bartock

until the Amended Agreed Order was independently terminated by the Ohio state court, the

testimony of Mr. Stringer did little to advance the inquiry.

Mr. Stringer displayed an obvious bias against Bartock manifested by his apparent,

personal dislike for Bartock for reasons not relevant to the current inquiry especially in light of the

successful judicial mediation and entry of the settlement agreement at issue here. Mr. Stringer's

testimony was in line with BAE's basic position, held throughout this litigation and related

bankruptcy proceedings, that is, despite the passage of the two-year temporal limitation contained

in the Noncompete Agreement by more than 4 months, because of Bartock's prior dealings with Ibis

Tek, he should be indefinitely precluded from employment by Ibis Tek. Despite repeated inquiries

by the Court during the course of this litigation concerning such extraordinary relief (given the

unfavored status of noncompete obligations as a restraint on free trade) BAE has never articulated

a solid basis beyond its own self-interested desire for such relief. Furthermore, the acknowledgment

by Mr. Stringer that he was not directly involved in either the negotiations between BAE and Ibis

Tek that led to the BAE-Ibis Tek Agreement, or the negotiations between BAE and Bartock that led

to the *Stipulation*, makes his testimony of even less usefulness to this Court in the task before it. The

issue before the Court, after all, is what the Parties agreed to by virtue of the *Stipulation*, not what

after-the-fact reasons BAE can present as to why it would prefer that Bartock not work for Ibis Tek.

## DISCUSSION

### (a)  Jurisdiction - Related Issues

The first issue to be addressed in this matter as with any matter arising before it, is

this Court's ability to provide the relief sought in the *Emergency Motion*.  It is not entirely clear

what BAE's position is with respect to the question of the Court's subject matter jurisdiction.  In the

"Conclusion" section of the *Brief in Support of the Motion of BAE Systems Survivability Systems,*

*L.L.C. to Dismiss or in the Alternative to Abstain* ("Brief in Support of BAE's Motion"), BAE asks

that the Court dismiss the case for "lack of jurisdiction."  *See* Document No. 9 at p. 19.  However,

aside from a reference to the *Rooker-Feldman* doctrine,[12] nowhere in the body of the *Brief in*

*Support BAE's Motion* is there actually articulated an assertion that the Court lacks subject matter

jurisdiction; only an argument that the Court should abstain from hearing the case, either because

such abstention is mandatory or should be done on a discretionary basis.  The *Brief in Support of*

*BAE's Motion* does argue that the Adversary Proceeding is a non-core matter, but the core/non-core

distinction is *not* relevant to the initial issue of subject matter jurisdiction of a court.  *See In re*

*EXDS, Inc.,* 352 B.R. 731, 732, n.1 (Bankr.D.Del.2006) (citing *Binder v. Price Waterhouse & Co.,*

---

[12]     The *"Rooker-Feldman"* doctrine prohibits federal district and bankruptcy courts from, in effect, sitting as appellate courts for state court judgements by depriving them of jurisdiction to review final state court decisions. *See, e.g., In re Knapper,* 407 F.3d 573, 580 (3d Cir. 2005).  BAE has not pressed the *Rooker-Feldman* argument further beyond the *Motion to Dismiss* but were it to do so the response would be that the doctrine is clearly inapplicable here because the Ohio Action was pending and no final judgment had been entered when the Adversary was filed. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544, U.S. 280 (2005).

20

*L.L.P. (In re Resorts Int'l, Inc.),* 372 F.3d 154, 163 (3d Cir. 2004) and holding that the determination

as to whether a matter is core or non-core has no bearing on the subject matter jurisdiction of the

bankruptcy court).   Similarly, when it filed its *Answer* in the Adversary Proceeding, BAE did not

raise lack of jurisdiction as a defense, although it did assert that the case was "non-core" except as

to the dischargeability issue regarding any relief obtained by BAE in the Ohio Action.   In the

*Answer*, BAE also asserted that it did not consent to the entry of any final orders by the Court with

respect to any non-core matters.

When it responded to the *Emergency Motion* BAE did  raise what appears to be a

jurisdictional question, albeit somewhat obliquely.   BAE asserted that Bartock "has not cited any

authority that would confer upon this Court the jurisdiction to declare that an injunction issued by

the Ohio Court is no longer enforceable."  *BAE Systems Survivability Systems L.L.C.'s Response to*

*Paul Bartock's Emergency Motion to Enforce Settlement and Sanctions*, Document No.51 at ¶92.[13]

When subsequently providing legal authority for its *Response* to the *Emergency Motion,* BAE

repeated that argument and also restated the "core/non-core" argument:

> At present, only the issue of the dischargeability of Debtor's obligations to
> BAE Systems is a "core" matter properly before this Court. BAE Systems
> has not submitted, and does not submit to the jurisdiction of this Court for
> any other purpose.

*Memorandum of Law in Support of BAE Stems Survivability Systems L.L.C.'s Response to Paul*

*Bartock's Emergency Motion to Enforce Settlement and Sanctions*, Document No. 72 at p. 10.

---

[13]     BAE similarly asserted that Bartock has not cited any authority that would allow this Court " to adjudicate the
contractual rights and obligations between Ibis Tek and BAE Systems." *Id.* at ¶94.  This is a complete red herring.  The Court
has repeatedly informed the Parties that it cannot and will not adjudicate contractual rights between BAE and Ibis Tek.

The Court is well aware of its independent duty to determine whether it has jurisdiction in a matter even in absence of the issue being raised by the Parties. *See In re Lages*, 386 B.R. 590, 596 (Bankr. W.D.Pa. 2008). That overall duty will be carried out here with particular attention to the two more focused issues the Court gleans from the BAE submissions discussed above: First, is the Court prevented from acting because this is a non-core proceeding? Second, does the Court have the power to enter an order that would have the effect of determining the continued enforceability of the Agreed Amended Order of the Ohio Action in light of the Parties' settlement here?

Core proceedings are those that "arise under" Title 11 or "arise in" a case under Title 11. *See Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006). A case "arises under" title 11 "if it invokes a substantive right provided by title 11," a concept analogous to the original jurisdiction given to district courts of all civil actions arising under the Constitution, laws, or treaties of the United States. *Id.* A case "arises in" a bankruptcy case if it "has no existence outside of the bankruptcy" and includes such things as administrative matters, orders to turn over property of the estate, and determinations regarding liens. *Id.* A non-exclusive listing of core proceedings is found at *28 U.S.C. §157(b)(2)*. Conversely, a non-core proceeding is one that is "related to" a bankruptcy case, meaning that "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Id.* Bankruptcy courts are permitted to hear and make final judgments in core proceedings, whereas in non-core proceedings they may hear the proceeding, but must submit proposed findings of fact and conclusions of law to the district court for entry of a final order or judgment unless the Parties otherwise consent. *See 28 U.S.C. §157(c)*.

22

Before turning to the core/non-core issue, the Court finds that it has subject matter jurisdiction to hear this case pursuant to *28 U.S.C. §§157(a), 1334(b)*.  These provisions confer subject matter jurisdiction on district courts, and through referral on bankruptcy courts, to hear cases "arising under" *Title 11*, or "arising in" or "related to" cases under *Title 11*.  In other words, subject matter jurisdiction spans the scope of all core and non-core matters.  It is clear that at the very least the case between Bartock and BAE set forth in this Adversary is "related to" Bartock's bankruptcy.  "Related to" jurisdiction is given a broad expanse and permits bankruptcy courts to exercise such jurisdiction in cases where the outcome "could conceivably have any effect on the estate being administered in bankruptcy." *In re EXDS*, 352 B.R. at 734 (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).  There is no doubt that the outcome of the dispute between Bartock and BAE will have a significant effect on the bankruptcy estate and in fact will determine whether a feasible plan can even be proposed.  As such, clearly this Court possesses subject matter jurisdiction power to finally determine the dispute between the Parties as raised in the Adversary Proceeding regardless of the ultimate answer to the questions presented.

The Court turns now to BAE's contention that the Adversary is at least in part non-core.  Were the Court deciding the "core/non-core" question in the absence of the *Stipulation* it is not at all certain what the answer would be.  It is clear that some aspects of the Adversary Proceeding represent core proceedings.  Those aspects seeking a determination that Bartock's obligations for breach of the Noncompete Agreement are dischargeable in this bankruptcy and that a discharge will void any injunction entered against him based on the Noncompete Agreement, are clearly core proceedings.  *See 28 U.S.C. §157(b)(2)(I)*.

23

It is less clear whether that part of the Adversary Proceeding seeking "immediate" relief, in the form of a determination that Bartock is immediately authorized (i.e., prior to discharge) to seek employment with Ibis Tek or another competitor of BAE, could be considered a core proceeding. Since there seems to be no dispute that Bartock must obtain employment in order to have any chance of funding a plan, it is at least within the realm of possibility that that aspect of the Adversary Proceeding could also qualify as core under *28 U.S.C. §§157(b)(2)(A)* or *(O)*. *See, e.g., In re Meyertech Corp.*, 831 F.2d 410, 416 (3d Cir. 1987) (stating that it is difficult to conceive of a proceeding that would not fall under the "all-encompassing" language of these two provisions, but nevertheless cautioning that an expansive interpretation may lead to incorrect and over-broad results regarding core proceedings). As it is, however, the Court does not need to make that potentially difficult determination because it finds that even if that part of the underlying Adversary Proceeding only implicates "related to" jurisdiction, and is thus non-core, the Parties have consented to the entry of a final order.[14]

The consent is found in the Parties' voluntary submission of the *Stipulation* to the Court and their request that it be entered as a final order, as further confirmed by their failure to appeal from the entry thereof. *28 U.S.C 157(c)(2)* permits the district court to refer a non-core proceeding to a bankruptcy court for hearing and final determination with the consent of all parties to the proceeding. *See In re Mullarkey*, 536 F.3d 215, 221 n.6 (3d Cir. 2008). The Court must

---

[14]    Paragraph 6 of the *Stipulation* provides that the settlement shall not be considered an acknowledgment by any of the Parties that any of the matters raised in the case are core bankruptcy matters. Apparently BAE wants to have it both ways: on the one hand, resolve the pending Adversary Proceeding, but on the other hand, cover its tracts so as not to acknowledge the authority of this Court to resolve the dispute. Regardless of BAE's positioning in this regard, the Court's resolution of the core/non-core issue does not implicate or run contrary to BAE's conditional language because it finds that even if this case is "non-core" the Parties have consented to the entry of a final order by this Court.

determine whether the voluntary submission of the *Stipulation* by the Parties with the request that it be signed and approved by the Court as an order constitutes consent under *28 U.S.C. §157(c)(2).*

A situation very similar to what happened here was presented to the Court in the case of *In re G.S.F. Corp.*, 938 F.2d 1467, 1476 (1ˢᵗ Cir. 1991), abrogated in part on other grounds by *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992). The *G.S.F. Corp.* court found that the parties had manifested their consent to the bankruptcy court deciding a non-core proceeding by submitting a stipulated settlement for court approval, noting that "[t]here can be no clearer sign of consent" than the submission of a stipulation and release with the court for entry as a final judgment. *Id.* at 1477. The fact that the consent was manifested before the bankruptcy court rather than the district court was not fatal to this conclusion since where an entire Title 11 proceeding has been referred to the bankruptcy court by the district court, consent to bankruptcy jurisdiction over related matters may be given in the bankruptcy court. *Id.* (citing cases). Furthermore, such consent was not required to be explicit. Implied consent will suffice. *Id.* (citing cases). The *G.S.F. Corp.* court found further support for its conclusion in the fact that neither party had appealed the bankruptcy court order in question.

The present case is similar to *G.S.F. Corp.* in all pertinent respects. BAE, together with Bartock, voluntarily chose to submit the *Stipulation* to the Court and asked that it be approved by the Court. Indeed, the settlement agreement between the Parties incorporated within the *Stipulation* provides that it shall be null and void unless it is approved by this Court. *See Stipulation* at ¶9. This is an exceedingly clear signification of consent by the Parties for this Court to make a

25

decision in the case by approving the *Stipulation* even if it would otherwise be a non-core proceeding. Three additional factors further bolster the conclusion that consent has been given.

First, for the reasons detailed above, the Court did not actually approve and sign the *Stipulation* until October 20, 2008, and then only after both Parties reiterated their desire to proceed with the settlement. This was a week after Bartock filed the *Emergency Motion* so BAE clearly had notice of the dispute involving the effect of the settlement on the enforceability of the Amended Agreed Order in the Ohio Action. In light of that development, BAE could have indicated it no longer desired for the settlement to be approved, thus leaving the Parties in their pre-settlement positions. Although the Court refrains from determining the ultimate effect of such a position under the circumstances, at no time did BAE attempt to retract its consent to the settlement. It chose to proceed. Second, part of the settlement agreement included a provision that the Adversary Proceeding would be dismissed after approval of the *Stipulation* by the Court, a clear indication that the parties viewed the *Stipulation* as a final determination of the matter. Third, BAE has not appealed the entry of the *Stipulation* by the Court.

For these reasons, the Court finds that pursuant to *28 U.S.C. §157(c)(2)* the Parties have effectively consented to its hearing and rendering a final determination of this matter, even if it would be determined to be a non-core proceeding absent such consent. *See also*, *e.g.*, *In re Derienzo,* 254 B.R. 334 (Bankr. M.D. Pa. 2000) (stipulation between parties qualified as unequivocal consent to bankruptcy court's exercise of Article III power over non-core, "related to" matters); *Fed'n of Puerto Rican Orgs. of Brownsville, Inc. v. Howe*, 157 B.R. 206 (E.D.N.Y. 1993) (where defendants agreed to have bankruptcy court judge sign settlement agreement and enter it as

26

an order of that court, they implicitly consented to that court's authority to enter a final order in the proceeding).

The remaining "jurisdictional" issue raised by BAE is whether this Court has the power to enter an order that may determine the continued enforceability of the Amended Agreed Order in the Ohio Action. Although BAE has phrased this as a question of whether this Court has "the jurisdiction to declare that an injunction issued by the Ohio court is no longer enforceable," the Court views that question not as a jurisdictional issue but rather as one of the preclusive effect of a valid, final order. When parties stipulate to the settlement of an action they "thereby 'consent to the exercise of the court's power to compel compliance.' " *Cooper-Jarrett, Inc. v. Cent. Transp., Inc*. 726 F.2d 93, 96 (3d Cir.1984) (quoting *Meetings & Expositions, Inc. v. Tandy Corp.,* 490 F.2d 714, 717 (2d Cir.1974)). *See also Stipulation* at ¶13 (Bankruptcy Court shall retain jurisdiction with respect to all matters arising from or related to settlement agreement).

If in order to enforce the settlement in this case between BAE and Bartock it is necessary to make a  finding that the Amended Agreed Order is no longer enforceable against Bartock, at least in part, such would be within this Court's power to grant. *11 U.S.C. §105(a)* provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." This has been interpreted to include the power to enjoin a state proceeding where necessary for the bankruptcy court to protect or effectuate its judgment. *See In re N. Ala. Anesthesiology Group, P.C.,* 154 B.R. 752, 755 n. 8 (N.D. Ala. 1993) (citing cases). Furthermore, although the "Anti-injunction Act," *28 U.S.C. §2283,* generally prohibits a federal court from granting an injunction to stay proceedings in a state court, there is an

explicit exception allowing it to do so "where necessary in aid of its jurisdiction, or to protect or effectuate its judgments", the so-called "relitigation exception." *See In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 314 F.3d  99, 104 (3d Cir. *2002)* (discussing the relitigation exception).

It is thus clear that this Court has the power, in the right circumstances, to make a determination that a state court order is no longer enforceable, and if necessary, to carry out the consequences of such a determination by enjoining the state court action.  It has yet to be determined in this Opinion whether this case presents circumstances warranting such relief, but as a general principle, the Court has the power to do so.  Thus, the second "jurisdictional" issue raised by BAE lacks merit as well.  Having made these initial determinations, the Court now turns to a review of the settlement agreement entered by the Parties, as embodied in the *Stipulation*.

*(b)   Interpretation of the Stipulation–Standard to be applied*

In reaching their settlement agreement the Parties expressly contemplated that (a) the settlement  would be null and void unless approved by this Court, and (b) that this Court would retain jurisdiction to enforce the terms of the settlement, regardless of what might happen with Bartock's bankruptcy case.  *See Stipulation* at ¶¶9, 13.  As noted above, this Court possessed the requisite subject matter jurisdiction to resolve the pending Adversary Proceeding before it.  Thus, once the *Stipulation* was signed by the Court and entered on the docket, it attained the status of a consent decree entered by a Court with appropriate jurisdiction.  *See, e.g.*, *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (a consent decree embodies an agreement of the parties and is also an agreement that the parties desire and expect will be reflected in and be enforceable as a judicial

28

decree that is subject to the rules generally applicable to other judgments and decrees). The fact that the *Stipulation* was not labeled as a "consent decree" does not change that conclusion since it bears all of the attributes of a consent decree. *See Aronov v. Chertoff,* 536 F.3d 30, 40 n. 8 (1ˢᵗ Cir. 2008) (citing cases for the proposition that an order containing an agreement reached by the parties and to be enforceable by the court is functionally equivalent to a consent decree).

Since a consent decree is issued upon the stipulation of the parties, it has the characteristics of a contract and contract principles govern its construction. *See McDowell v. Phila. Hous. Auth.,* 423 F.3d 233, 238 (3d Cir. 2005). The scope of a consent decree is discerned by examining the language within the four corners of the document. *United States v. State of New Jersey,* 194 F.3d 426, 430 (3d Cir. 1999). The court should not attempt to strain the terms or impose additional terms to reconcile the decree with its own conception of the purpose of the decree. *Id.* Resort to extrinsic evidence is permissible but only when the decree itself is ambiguous. *Id.* Nevertheless, circumstances surrounding the formation of a decree are always relevant to its meaning. *Id.* (citing *Fox v. U.S. Dep't. of Hous. & Urban Dev.,* 680 F.2d 315, 319 (3d Cir. 1982)). Additionally, documents expressly incorporated into the decree may be used as an aid in construction. *United States v. I.T.T. Cont'l Baking Co.,* 420 U.S. 223, 238 (1975).

A consent decree is to be construed in light of its principal purpose. *United States v. Readers Digest Ass'n., Inc.,* 662 F.2d 955, 962 (3d Cir. 1981). It is also permissible to consider the reasonable expectations of the parties when they entered into the consent decree. *See Transtech Indus., Inc. v. A & Z Septic*, 798 F. Supp. 1079, 1088 (D.N.J. 1992); *United States v. Angle*, 760 F. Supp. 1366, 1371 (E.D. Cal. 1991).

### (c)   Interpreting the Stipulation

The *Stipulation* is a fairly extensive document, and it includes the Noncompete Agreement as an attachment.  As such, it too will be considered as an integral component for purposes of interpreting the *Stipulation.  I.T.T. Continental Baking.*  Despite the extent of the documented content of the *Stipulation*, its terms are clear and unambiguous.  As such, there is no need to resort to extrinsic evidence for purposes of its interpretation.  The intent of the document can be construed from its "four corners."  Nevertheless, before beginning the process of construing the *Stipulation*, it is appropriate to briefly set forth the respective positions of the Parties on the disputed point.  *United States v. State of New Jersey.*

Bartock contends that the *Stipulation* removes all impediments to him obtaining employment with any competitor of BAE, including Ibis Tek, because the only basis that existed for such a non-compete prohibition, Paragraph 4 of the Noncompete Agreement, has been released by BAE in Paragraph 3 of the *Stipulation*.  On the other hand, BAE argues that the *Stipulation* only extends to Paragraph 4 of the Noncompete Agreement and that the Amended Agreed Order in the Ohio Action remains enforceable against Bartock, representing a wholly separate and independent impediment to Bartock going to work for Ibis Tek that was not removed by the Parties' settlement in this Adversary Proceeding.  For a number of reasons the Court finds the interpretation urged by Bartock to be the correct one.

First, it was apparent to both Parties that Ibis Tek represented a special case that was of particular interest to Bartock.  Not only was Ibis Tek the entity he was working for when the

30

temporary restraining order was entered in the Ohio Action which prevented him from continuing

to do so, it is also the only entity identified by name in the *Amended Complaint* in this Adversary

Proceeding wherein Bartock specifically asked the Court to allow him "to immediately seek

employment from Ibis Tek ...." *Amended Complaint* at "Prayer for Relief", ¶(c).  Given the

centrality of Ibis Tek to the dispute, in the absence of any express language to the contrary and in

light of the clear and unambiguous wording used in Paragraph 3 of the *Stipulation*[15] it is inherently

implausible that the Parties intended to reach a settlement that would exclude only Ibis Tek from the

BAE competitors for whom Bartock could now work.  Put another way, in light of the circumstances

surrounding the settlement, if the release was somehow to be limited in extent with respect to Ibis

Tek, the natural course would have been to specify that proposition in the *Stipulation,* which was

not done.

Second, when the fact of a likely settlement was first verbally reported to the Court

by the Parties, something the Court views as a relevant part of the circumstances surrounding the

settlement, it was stated by counsel for Bartock that the Parties had reached an agreement that would

allow Bartock to "go back to work or to become gainfully employed." *See Transcript of Hearing,*

August 11, 2008 at p. 4, l. 7-8, Document No. 53.  Furthermore, Counsel for BAE acknowledged

that the representations by Bartock's attorney as to the settlement were accurate. *Id.* at p. 5, l. 24

through p. 6, l. 18.

There are two possible ways to interpret the statement of Bartock's attorney, neither

of which is helpful to BAE.  One interpretation is that the "go back to work" phrase referred

---

[15]    "In exchange for the promises ... of Bartock ... BAE has released Bartock *from any non-competition obligation* found in Paragraph 4 of the Noncompete Agreement ...." *Stipulation*, Document No. 55, ¶3.  (emphasis added)

implicitly to Ibis Tek because that is where Bartock had been working before being enjoined from doing so by the Ohio court. The other interpretation is that the "go back to work" and "or to become gainfully employed" phrases were just redundant ways of saying the same thing and did not refer to any certain employer. But even if this second interpretation is accepted, it does not change the fact that Ibis Tek was not mentioned, and not excluded, from the unqualified statement that Bartock could seek employment under the settlement.

Third, the *Stipulation* provides without qualification that BAE was releasing Bartock from "any non-competition obligation found at Paragraph 4 of the Noncompete Agreement." See *Stipulation* at ¶3. Since there was no other source of a non-competition obligation owed by Bartock, the reasonable conclusion to be reached from reading this language is that henceforth Bartock would be free to seek employment with *any* competitor of BAE. It is no answer to say that the Amended Agreed Order represents a separate source of non-competition obligation because it was only entered based on the existence of the Noncompete Agreement and is, in essence, a derivative of the Noncompete Agreement. Once Bartock's obligations under the Noncompete Agreement "go away" by virtue of the settlement agreement reached here, there is no underpinning for the Amended Agreed Order. That Order is, in a sense, similar to a monetary judgment that has been paid off or settled by the defendant, but not yet satisfied of record. Even though the judgment still exists "on paper," it has lost its effectiveness as against the defendant and only awaits the proper procedural step to be formally voided.

Fourth, the *Stipulation* which "on its face" and within the "four corners" of the document is clear and unambiguous, provides that:

> [a]ll rights, causes of action, claims and/or benefits of the Parties, or any
> single Party, that are not expressly waived or modified by this Settlement
> Agreement are preserved, and not effected [sic] by this Settlement
> Agreement. The Parties preserve all other issues between them, specifically
> including but not limited to:
>
> a.    the remaining issues in the Butler County Action, including but not
>       limited to a determination of what, if any, damages flow from
>       Bartock's alleged breaches of the Noncompete Agreement that
>       occurred prior to July 28, 2008.

*Stipulation at ¶4(a)*. This language favors Bartock's interpretation in a number of ways. For one, BAE's right or claim against Bartock with respect to non-competition was expressly waived. For another, the use of the term "remaining issues" in reference to the Ohio Action clearly implies that at least some of the issues that had been implicated in that case were resolved as a result of the settlement here and therefore no longer "in play." The release of the noncompete was, of course, a centerpiece of the settlement under review and the reasonable conclusion to be drawn is that it was one of the issues resolved here and thus not a "remaining" issue in the Ohio Action. Finally, the reference to July 28, 2008, as the cutoff date for any damage award in the Ohio Action is yet another indication that the Parties intended that Bartock be fully free to compete after that date without fear of repercussion.[16]

For all of the above reasons, the Court finds that it is clear from its unambiguous language that the intent of the *Stipulation* was to completely free Bartock of any non-competition obligations vis-a-vis BAE, making the Amended Agreed Order non-enforceable as against him and moot to the extent it may, in a vacuum, provide otherwise.

---

[16]    Although the Parties have not informed the Court how they arrived at an effective date of July 28, 2008 for the noncompete release, the Court notes that this date is the two year anniversary of the date upon which Bartock received his final payroll payment from Ibis Tek. It therefore is the date upon which the original Noncompete Agreement would have run and expired by its own terms even using BAE's "worst case" time calculation. *See* p. 9, *supra.*

BAE did make several arguments in support of a contrary interpretation, but none is persuasive.[17] It points out that Ibis Tek was not referenced or identified in any of the settlement discussions and is not mentioned explicitly in the *Stipulation*. BAE argues that the lack of such discussions demonstrates that the Parties did not intend to abrogate the Amended Agreed Order. However, as explained above, the Court concludes that the reasonable expectation of the Parties based on the clear and unambiguous language of the *Stipulation* was that the non-compete release would be unlimited absent a clear "carve-out" included for Ibis Tek due to the Amended Agreed Order. To counter this reasonable expectation, BAE must point to some language in the *Stipulation* putting Bartock on notice that the agreement was otherwise. It cannot do so.

BAE also tried to make much of the fact that one of the recitals in the *Stipulation* is that the Amended Agreed Order "remains in effect," viewing that provision as an admission by Bartock. The short answer to that argument is that the *Stipulation* was obviously prepared and signed by the Parties before it was signed and approved by the Court, at a time when the Amended Agreed Order ostensibly remained in effect.

Similarly, BAE pointed out that when, pursuant to the mediation settlement reached before Judge Deller, Bartock filed his *Withdrawal* in the main case, he indicated he was seeking relief from the automatic stay so that he could "immediately seek the termination of the [Amended Agreed Order] by the Court of Common Pleas of Butler County, Ohio." *Id. at ¶10.* BAE seeks to portray this too as an admission by Bartock that the Amended Agreed Order remained enforceable

---

[17]     BAE admits that the only remaining precondition to Bartock's employment by Ibis Tek is found in ¶11(d)(a) of the Ibis Tek Agreement, i.e., "the Agreed Restraining Order [Amended Agreed Order] is no longer enforceable as to Bartock."

against him and only the Ohio court could provide relief from it. However, this document was filed

on November 7, 2008, *after* the issues raised in the *Emergency Motion* had become apparent but

before the Parties knew how this Court would rule on it. Bartock testified at the evidentiary hearing

that upon "advice of counsel" the filing had been made to "cover all the bases." The Court views

Bartock's testimony in this regard as a reasonable explanation for the subject filing and accepts his

testimony in this regard as credible.

BAE also argued in its memorandum of law opposing the *Emergency Motion* that

Bartock's interpretation cannot be correct because the Parties lack the power to affect the Amended

Agreed Order by their own agreement. *See, e.g.,* Document No. 72, p. 11 ("Moreover, even if the

parties intended to negate the Amended Agreed Order, they could not have done so, because parties

to a contract cannot agree that a court order is unenforceable.") However, that is contrary to the

clear language of the Amended Agreed Order itself, which expressly states that it "shall expire upon

further order of the court, following notice and hearing, *or agreement of the parties*." *See BAE*

*Evidentiary Hearing Exhibit 1*, Document No. 76 (emphasis added). The *Stipulation* clearly

manifests the agreement of the Parties to terminate the non-competition aspect of the Amended

Agreed Order and release Bartock from its effect. Therefore, the terms of state court Amended

Agreed Order are clear: the prohibitions contained in the Amended Agreed Order are no longer

enforceable, no further court action by the Ohio court is required, and, the order is rendered moot

by its own terms.

Finally, BAE's overall position is logically inconsistent. BAE states that immediately

after the settlement agreement Bartock was allowed to seek employment with every other competitor

35

of BAE *except* Ibis Tek.  It argues that Ibis Tek was excluded due to the combination of the BAE-Ibis Tek Settlement Agreement (which prevents Ibis Tek from employing Bartock as long as the Amended Agreed Order is enforceable against him) and the continued existence of the Amended Agreed Order (which BAE contends can only be abrogated by the action of the Ohio court).  *See BAE Response to the Emergency Motion*, Document No. 51 at ¶¶57, 77, 85, 89.  However, if BAE were correct in the second part of its contention, there would be no support for its statement that Bartock is free to seek employment with all of these other competitors because they likewise are included in by the Amended Agreed Order, which extends not just to Ibis Tek, *but to all competitors of BAE*.

In other words, the logical conclusion of BAE's position that nothing done in this Court can impair the effectiveness of the Amended Agreed Order would be that Bartock even now cannot obtain employment with any competitor of BAE, not just Ibis Tek.  Such a notion would belie the claim by BAE that he has "thousands of potential employers" to choose from and would make the settlement agreement totally illusory.[18]

*(d)   Relief to be provided*

Now that the Court has determined that the *Stipulation* was intended to completely release Bartock from all non-compete obligations he had with BAE, including any embodied in the Amended Agreed Order, the question becomes what relief should be provided.  In other

---

[18]    For the sake of argument, the only other possibility the Court can envision is that BAE is arguing that the *Stipulation* made the Amended Agreed Order non-enforceable in part (with respect to all the other BAE competitors) while keeping it enforceable when it comes to Ibis Tek.  There is no support anywhere in the language of the *Stipulation* for such purported hair-splitting and the Court will not presume such an absurd result.

circumstances, the Court might be persuaded that overriding considerations of judicial comity should

result in deferring to the Ohio court allowing it to take the appropriate action to formally modify or

vacate the Amended Agreed Order to bring it into conformity with the *Stipulation,* as interpreted

herein. The Ohio court should do so because it would be bound to do so under Ohio principles of

*res judicata*, as explained briefly below.

> The doctrine of *res judicata* under Ohio law has been explained as follows:
>
> The doctrine of res judicata is that an existing final judgment rendered on
> the merits, without fraud or collusion, by a court of competent jurisdiction,
> is conclusive of rights, questions and facts in issue, as to the parties and
> their privies, in all other actions in the same or any other judicial tribunal
> of concurrent jurisdiction.

*Norwood v. McDonald*, 142 Ohio St. 299, 305 (1943). Furthermore, under Ohio law a consent

judgment operates as *res judicata* with the same force as is given to a judgment entered on the merits

in a fully adversarial proceeding. *See, e.g., Horne v. Woolever*, 170 Ohio St. 178, 182 (1959),

*Schlangen v. Allied Pest Control, Inc.,* 2006 WL 1284458 *4 (Ohio App 2 Dist. 2006)*. The Ohio

court would thus be bound by Ohio law to give *res judicata* effect to the *Stipulation* and this Court's

determination that BAE's claim against Bartock as to his non-compete obligation is concluded. The

fact that the Ohio Action was commenced before this bankruptcy proceeding does not change that

conclusion. *See*, *e.g.*, *Terra Nova Ins. Co. Ltd. v. 900 Bar, Inc.*, 887 F.2d 1213, 1227 (3d Cir. 1989)

(where identical cases between identical parties proceed in separate fora, resolution of one, even by

settlement, necessarily precludes litigation of the other); *Restatement, Second, Judgments §14*

(1982); *Fort Frye Teachers Ass'n. OEA/NEA v. State Employment Relations Board*, 81 Ohio St. 3d

392, 395, n. 3, 692 N.E. 2d 140 (1998).

Despite the clear law on point, if this Court were to defer to the actions of the Ohio court in resolving the effect of its order in light of the decision of this Court, there is no assurance how quickly the matter could be acted upon by that court. Perhaps of even more concern is the possibility that allowing the Ohio court to act, regardless of the outcome, will simply offer BAE one more opportunity to look for a reason to avoid its obligations under the *Stipulation* and add yet another burden on Bartock by requiring him to appear and defend an additional matter in that court.[19] To avoid those possibilities and considering the somewhat exigent circumstances in which Bartock finds himself because of his current inability to obtain gainful employment, the Court concludes that any consideration of comity in this case must give way to the need for immediate and certain relief. As indicated previously in this Opinion, federal law provides the necessary tool to do so in these circumstances, authorizing the Court to enjoin the Ohio Action "where necessary...to protect or effectuate its judgments." 11 U.S.C. §2283. The purpose of this "relitigation exception" is to permit federal courts to prevent state litigation of issues previously presented to and decided by the federal court. *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147-48 (1988).[20]

---

[19]     Mr. Retter testified at the evidentiary hearing that the Ohio state court action was basically abandoned by Bartock in its late stages, *inter alia*, because Bartock could not afford housing there during its pendency let alone the responsibility for payment of attorney fees (which had been paid for a time by Ibis Tek).

[20]     It is perhaps worth noting that the term *res judicata* actually encompasses two distinct concepts. As the Supreme Court has explained:

> *Res judicata* is often analyzed further to consist of two preclusion concepts: "issue preclusion" and "claim preclusion." Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided.... This effect also is referred to as direct or collateral estoppel. Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar.

> *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 1984) (citation omitted).

Furthermore, there is some dispute as to whether the relitigation exception under *Section 2283* permits an injunction against state proceedings based on either claim preclusion or issue preclusion, or only the latter. *See, e.g.*, *Weyerhauser Co. v. Wyatt* 505 F.3d 1104, 1109-12 (10th Cir. 2007). Even taking a conservative approach and assuming that only issue preclusion is sufficient to invoke the "relitigation exception" under *Section 2283*, it is clear that the determination that Bartock is free of any non-compete obligation represents a matter that has been litigated and decided in this Court and is the same issue pending in the Ohio court.

Therefore, under the current set of circumstances, the Court finds it necessary to take action to enforce the *Stipulation* and further notes that the Ohio court has not ruled on the merits of the *res judicata* issue, leaving this Court free to issue an injunction pursuant to *11 U.S.C. §2283. See Parsons Steel, Inc. v. First Ala. Bank,* 474 U.S. 518 (1986).  *See also, e.g.*, *Huguley v. Gen. Motors Corp*., 35 F.3d 1052 (6th Cir. 1994) and 999 F.2d 142 (6th cir. 1993) (district court judge determined that consent decree in federal class action had *res judicata* effect in state case and enjoined state case under "relitigation" exception to the *Anti-Injunction Act*); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355 (3d Cir. 2001) (approving lower court's issuance of an injunction preventing  insurance policyholders who were members of federal class action from pursuing in state court claims that had been settled as part of class action settlement.)  The Court will thus fashion an injunctive remedy to effectuate its decision here while tailoring it as narrowly as possible to minimize its intrusion on the Ohio court.

There is also the question of whether, and if so, to what extent, any monetary damages should be awarded.  It is clear that BAE's unsupported insistence that the Amended Agreed Order remained enforceable against Bartock even after the Parties' reached their settlement was the proximate cause of Ibis Tek's withdrawal of a job offer to Bartock.  BAE's actions therefore resulted in substantial lost income to Bartock and the bankruptcy estate.  The un-refuted testimony of Bartock and Mr. Retter establishes that, but for the BAE's position, Bartock would have been employed several months ago at an annual salary of $125,000, which equates to a daily rate of pay of $342.46.

The Court views the most appropriate source of its power to sanction BAE in this case as the civil contempt power which resides in bankruptcy courts pursuant to *11 U.S.C. §105(a)* to remedy a violation of their orders. *See In re Joubert*, 336 B.R. 241, 251 (Bankr. W.D. Pa. 2006). The requirements to impose civil contempt are: (1) a valid court order exists; (2) the defendant had knowledge of the order; and, (3) the defendant disobeyed the order. *Id.* (citing *Harris v. City of Phila.,* 47 F.3d 1311 (3d Cir. 1995). A bankruptcy court has the authority to impose civil contempt to enforce compliance with a court order and to compensate a party damaged by a violation of that order. *In re Swanson*, 207 B.R. 76, 90 (Bankr. D. N.J. 1997). Because civil contempt serves a remedial purpose, proof of willfulness is not required for a sanction to be imposed. *Id. A fortiori*, it is not necessary to make a finding of bad faith to impose a civil contempt sanction. *See, e.g., In re Elias*, 98 B.R. 332, 337 (N.D. Ill. 1989).

Applying these principles to the present case, the Court first notes that although the Parties submitted their settlement on August 26, 2008, the *Stipulation* was not actually signed by the Court (thereby becoming an enforceable order) until October 20, 2008. Even if it were inclined otherwise, the Court cannot award any sanctions for any period of time before the date the *Stipulation* was actually signed by the Court. *See Institute for Motivational Living, Inc. V. Doulos Institute for Strategic Consulting, Inc.*, 110 Fed. Appx. 283, 287 (3d Cir. 2004).

With that limitation in mind, the Court finds that sanctions should be awarded commencing October 21, 2008. There was a valid Order as of that date, BAE had knowledge of it, and it disobeyed the Order by intransigently refusing to recognize the clear effect of that Order vis-a-

vis the Amended Agreed Order.  Bartock was damaged by BAE's disobedience of the *Stipulation*.

He has lost several months of income that he would have earned as an employee of Ibis Tek but for

BAE's actions.  Sanctions are additionally justified in this case because BAE has harmed not just

Bartock but the bankruptcy estate as well.  Since this is an individual Chapter 11 case, property of

the estate includes post-petition earnings of Bartock.  *See 11 U.S.C. §(a)(2)*.  Thus, by its conduct

BAE has harmed all of the creditors of the estate.  For these reasons the Court finds an appropriate

compensatory sanction to be $342.46 per day, commencing as of October 21, 2008, and continuing

each day thereafter until Bartock begins employment with Ibis Tek, which the Court assumes will

occur promptly after this Order is entered.

Bartock also asked for an award of attorney fees against BAE as a sanction for failing

to abide by the terms of the settlement.  The Court need not decide whether such an award would

be permitted or justified under the facts of this case.  Bartock originally sought an expedited hearing

and then requested the continued hearing following the judicial mediation but failed to advance any

record evidence whatsoever concerning attorney fees at either of these hearings.[21]  Admittedly

attorney time was expended in filing the pleadings and conducting the evidentiary hearings.  But in

the absence of any specific record evidence as to the attorney fees claim, the Court will not exercise

its discretion to include any such fees as part of the sanction imposed against BAE.

---

[21]     Near the end of the November 13, 2008 evidentiary hearing following the close of evidence and during final arguments, the Court commented on Bartock's failure to have submitted any evidence to support an award of attorney fees.  Counsel for Bartock stated in response, for the first time, that if the *Emergency Motion* was granted it would be his intention to then submit an attorney's fee petition.  At no prior time during either of the hearings did Bartock's Counsel indicate that was his plan.  However, if attorneys fees continued to be sought, evidence had to be presented in support of the claim at the time of the hearing by the Debtor consistent with the request made in the pleadings.

41

### CONCLUSION

For all the above stated reasons, the *Emergency Motion* will be granted.  The Court will enter an Order finding that all impediments to Bartock competing against BAE have been removed by reason of the *Stipulation* including any impediments contained in the agreed Amended Agreed Order in the Ohio Action.  An injunction order will be issued directed to the Ohio court to effectuate this Court's order in this regard.  Sanctions will be awarded against BAE to compensate Bartock for the damages he has suffered from BAE's actions resulting in Ibis Tek's unwillingness to hire him until this Court provided further relief.  Furthermore, as a result of the Consent Order issued following completion of the judicial mediation, BAE's *Motion for Relief From Automatic Stay*, Document No. 77 in Case No. 08-20174 will be granted and BAE will be given leave to litigate the remaining issues in the Ohio Action, as circumscribed by the Injunction Order to be issued in this matter.

An appropriate order will issue.


Dated: December 9, 2008

Thomas P. Agresti
United States Bankruptcy Judge


Case Administrator to serve:
    United States Trustee
    Michael Kaminski, Esq.
    John R. Gotaskie, Jr., Esq.
    Toby K. Henderson, Esq.